HARRY ESTILL *et al., v.* PETER S. DECKERD, *et al.*

1. STATEMENT. Wallis Estill, Sr., dying in 1835, devised a portion of his "Crow Creek" tract to his executor in trust for his slaves, stipulating for their residence and employment thereon under his control: the profits of the farm to go to the use of the slaves and their offspring, after deducting an annual rent to the estate to be fixed by the executor. At the end of twenty years, they were to be emancipated, unless, by misconduct, they forfeited their right to freedom; in which event they were to be sold. The farm, at the end of that time, was to be divided among them in lots at the discretion of the executor; the title remaining in him as trustee, and, in the event of his death before effectuating these purposes intestate and without an executor, the Court was to appoint some one, among several persons mentioned by the testator as "representatives," to do so. A codicil provides for the sale of the land, and investment of proceeds in other land, subject to the same trust. The slaves were removed to the "Crow Creek" tract, but the executor died in 1847, without selling it, and his executor failing to qualify, P. S. Deckerd, one of the so styled "representatives," was appointed by the County Court as *administrator de bonis non cum testamento annexo* of the estate of Estill, Sr. On June 28, 1848, Kincaid and others filed their bill against the administrator and others for an adjustment of matters relating to the estate. In August, 1849, the administrator, by petition in the cause, applied for a sale of the "Crow Creek" tract, and at the February Term, 1850, reported a sale thereof to his brother, David, at $15 per acre, which, being afterward confirmed, they jointly conveyed to Stevenson, October 1, 1853, who was to pay $20 per acre for the tillable land, reference being made in the deed to the proceedings in Kincaid *v.* Deckerd, in regard to the sale and title to said land. Stevenson afterward conveyed the land to Alloway. By petition in the cause, August 19, 1853, the administrator obtained an order of sale for land alleged to have been bought with proceeds of sale of the "Crow Creek" land. Kincaid amended his bill in January, 1849, and sought to subject the slaves to sale for alleged misconduct. His application was refused, the administrator resisting it, who, however, afterward, becoming owner of a number of interests in the estate, made a similar application, by petition, in the cause, which was granted, subject, however, to the right of the slaves to contest the correctness of the

decree. In none of these proceedings, either in the bill or amended bill or petitions, were the slaves made parties or represented. On September 12, 1853, they, by next friend, brought a bill against the administrator, to enjoin their sale, and at February Term, 1855, a decree was entered accordingly, and declaring their emancipation upon complying with the terms of the Statute on the subject; and at the same time this cause was consolidated with that of Kincaid *v.* Deckerd. At the August Term, 1857, a decree was entered, headed as follows: "Kincaid, *et al., v.* Deckerd, Stevenson, *et al.,* and Sam and others, by next friend, *v.* Stevenson, Kincaid, *et al.,* and Crisman *v.* Deckerd, *et al.*" The decree vests the title in the "Crow Creek" land in Stevenson; gives the proceeds of a note given by Stevenson, in the hands of another, to Sam and the other negroes suing, and recites that it goes to them or their trustee, as a payment of their interest in the land under the will, etc. The books of the Court being destroyed or lost during the civil war, parts only of the records in these causes were exhibited in the present suit, which is a bill filed by the negroes, in 1865, against Deckerd, Stevenson and Alloway, setting up their title to the "Crow Creek" land, as beneficiaries under the will, alleging that it had been disposed of under proceedings to which they were not parties: first, to the administrator himself, through his brother, David, and by them to Stevenson, who conveyed it to Alloway—praying that the cloud upon their title, caused by these deeds, be removed, and for rents and a receiver. Stevenson and Alloway answer, relying mainly upon a plea of former adjudication, supported by the records in the consolidated causes herein before recited.

*Held:* RES ADJUDICATA. The defence of former adjudication cannot be sustained by the facts set forth in the above statement, and the effect of the consolidation of the causes in 1855 was not such as to make the decree of August, 1857, divesting and vesting title to the land, binding upon the negroes, neither Stevenson or the slaves, so far as it appears, having never been made parties to the bill of Kincaid *v.* Deckerd, under which the land was sold, either before or after the consolidation, and the consolidation itself not having the effect to make them such. Furthermore, that Stevenson never having been made party to the bill of the negroes by their next friend in 1853 against Deckerd to enjoin their sale, resulting in the decree declaring their right to emancipation in 1855, the date of the consolidation of the two causes, there was, consequently, no pleading, in either case, to bring about a contest between either Deckerd and the slaves, or Stevenson and the slaves, as to the title of the slaves to the land in controversy.

Estill *v.* Deckerd.

2. CHANCERY JURISDICTION. *Removal of cloud from title. Estoppel. Maxim.* Parties are not estopped from prosecuting a bill to remove a cloud from their title to land, the cloud consisting of deeds void for the want of authority in the original vendor to sell, because under the color of legal proceedings they had received a portion of the proceeds of sale; but they are, nevertheless, accountable for so much thereof as came into their possession and use. Asking equity, they must do equity.

3. SAME. *Same.* In a bill to remove a cloud from title, the complainant must show the legal title to be in himself, and that the other has a mere appearance, without the reality.

4. TRUST PROPERTY. *When title to beneficiary becomes absolute, etc.* Where real property is given to one in trust for another, and the objects of the trust·are completed, or the trust has become impracticable, the property vests absolutely in the beneficiary. But where property is ordered to be sold by a will, and proceeds directed to be invested in other property, whether on a continuing trust or otherwise, no title can accrue to the beneficiary of the first property. His title, if it accrue at all, will become absolute only either in the property to be bought or in the proceeds of the first property.

Case cited: White *v.* Belote, 2 Head, 703.

5. SAME. *Administrator de bonis non, etc.* Where a will creates a trust to be performed by the executor, and the executor dies, and the County Court appoints *an administrator de bonis non,* with the will annexed, such appointee has no authority to execute the trust.

Case cited: Gee *v.* Graves, 2 Head, 242.

FROM FRANKLIN.

Appeal from the Chancery Court. JNO. P. STEELE, Chancellor.

A. S. MARKS and JORDAN STOKES, for complainants.

G. M. FOGG, JOHN FRIZZELL and TURNEY, for defendants.

EWING, S. J., delivered the opinion of the Court.

Wallis Estill, Sr., died in the year 1835, in Franklin County, Tennessee, where he had resided. He made a will. He had a large estate, real and personal, which he devised and bequeathed to his widow and children and others, except certain slaves, in regard to whom he made certain provisions in his will. By the third clause of his will, it is provided "that after three years from my death my executor shall remove my slaves to my tract of land on Crow Creek and lay off one hundred and fifty acres thereof—the upper end—and, if he thinks proper, fifty acres more, at his discretion—which I hereby give to my executor in trust for the use hereinafter mentioned, viz: My said negroes are to reside and labor on said land, under superintendence and control of my executor (such farm paying annually to my estate such sum as my executor, with the advice of my representatives, may prescribe; the balance to be applied to the maintenance, etc., of said slaves and their offspring), for twenty years, during which time said slaves are to be subject to the authority, etc., of my executor." By the same clause it is provided that at the end of the twenty years said slaves and their offspring are to be emancipated, and said land to be divided into lots, as my executor may think just, and assigned to the different families of my negroes and their use forever—the title thereof to remain in my executor in trust for them. By the same clause a provision is made

that, for mal-conduct by the slaves, they may forfeit their right to freedom, and in such case they are ordered by the will to be sold, etc. By the twentieth clause of the will, he appoints as what he calls his representatives, Nathan Green, Benjamin Deckerd, P. S. Deckerd and David Deckerd, to settle controversies under his will and to do some other things specially provided for under it. By the twenty-second clause, he appointed his son, Wallis Estill, his executor, and by the twenty-third clause he provides that if his son, Wallis, should die before this will should be carried into full effect, without making any will or appointing any executor, then that some one of his representatives, who might be selected by the Court, take upon himself the execution thereof and be vested with all the powers hereby conferred on his son Wallis. These are all the provisions of the bill of Wallis Estill, Sr., necessary to be referred to.

There were, however, three codicils to said will. By the second an additional executor was appointed, who, however, never became qualified, and of whom it is not necessary to take further notice. By the third codicil it was provided as follows: " Taking into consideration the moral and religious benefit of my slaves who are to reside on my lands on Crow Creek and for their moral welfare, my will is that the lands to be laid off to them there be sold by my executor and the proceeds applied to the purchase of a tract of land on this side of the mountain, where my executor can the better have the oversight and

control of said slaves, which tract, when purchased, is to be subject to all of the provisions in my said will in relation to the Crow Creek lands." It is assumed by the parties on both sides, that the said Wallis Estill, Jr., became regularly qualified as executor of said will and assumed the execution of its trusts; probably placed the slaves on a portion of the Crow Creek tract of land and gave them some supervision. He died, however, in the year 1847, not having sold these lands. He made a will and appointed an executor, who, it is, however, said and admitted, did not become qualified as such. In some manner, before the 28th of June, 1848, Peter S. Deckerd, one of the persons mentioned in the will of Wallis Estill, Sr., as representatives, seems to have come into the management of his estate. He is called, in the parts of records produced as evidence in this cause, sometimes executor and sometimes executor *de bonis non.* He appears, however, to have taken it upon himself to act as the representative of the estate of Wallis Estill, Sr. He may have been, and probably was, appointed in some way by the County Court of Franklin County; whether as administrator *de bonis non* with the will annexed, or as a substituted executor under a supposed power conferred by the will of Wallis Estill, Sr., does not appear. On the 28th of June, 1848, Wallis Kincaid, a party interested under the will of Wallis Estill, Sr., along with others, filed his bill in the Chancery Court of Franklin County against the said Peter S. Deckerd and others for an

adjustment of all matters (as it is supposed) in regard to the estate of Wallis Estill, Sr., deceased. To this bill, so far as it appears, the present complainants (who are a part or all of the slaves above-mentioned) were not made parties; indeed, it does appear, by incidental statements in one of the parts of record offered as evidence, that they were not parties. In this cause it is said that, in August, 1849, Peter S. Deckerd filed a petition to sell the Crow Creek lands ordered to be sold as aforesaid under the will of Wallis Estill, Sr., to have the proceeds invested according to the terms of the said will; not, however, making the slaves parties. At the February Term, 1850, said Deckerd made a report in regard to the sale of said lands, which, however, does not appear, though we gather from a subsequent decree in the cause that he reported a sale to his brother, David Deckerd. Before this report, however, on the 27th of January, 1849, the said Wallis Kincaid and others had amended their bill and prayed for a sale of said slaves on account of alleged misconduct on their part, by which they had forfeited their freedom. Upon this amended bill, which was resisted by P. S. Deckerd (the slaves still not being made parties), the Court seems to have refused to sell said slaves. Afterward, and before the 12th of September, 1853, the said Peter S. Deckerd, having purchased a number of the interests in the estate of Wallis Estill, Sr., applies to the Court, in the case above-mentioned, by petition, to have said slaves sold as having forfeited their right to freedom

by misconduct. Under this application, an order was made for the sale of the slaves, they still not having been made parties. The Court making the order for the sale is said, however, to have remarked that the slaves would have a right to come in hereafter and contest the correctness of said decree. On the 12th of September, the slaves—a large portion, if not all, of them—by Garrett Estill, as their next friend, filed what they call their petition, but what is in all its forms an original and injunction bill, against Peter S. Deckerd, as executor of Wallis Estill, Sr., and enjoin their sale. To this Deckerd makes answer, and at February Term, 1855, a decree was entered enjoining the sale of the slaves and declaring them emancipated upon complying with the Acts of Assembly in such cases made and provided. At this Term, and at the same time with the making of this decree, this last cause was consolidated with the cause of Wallis Kincaid *et als.*, *v.* P. S. Deckerd, and others. In the meantime, the report of Peter S. Deckerd, of the sale of the Crow Creek land to his brother, David, at $15 00 an acre, had been confirmed. And on the 19th of August (the decree for the sale of the slaves having been made on that day), on the petition of P. S. Deckerd, in the case of Kincaid *v.* Deckerd, a decree was made for the sale of certain lands which Deckerd alleged he had bought with the proceeds of sale of the Crow Creek lands. On the 1st of October, 1853, David Deckerd and Peter S. Deckerd make a deed for the Crow Creek land to Stevenson, in

which no amount of acres is expressed, but the boundaries are the same as of the land reported to have been sold by P. S. Deckerd, commissioner, to David Deckerd, and Stevenson was to pay $20 00 an acre for all of the tillable land. Reference is made in the deed to the proceedings in the case of Wallis Kincaid, *et als., v.* P. S. Deckerd, *et als.,* in regard to the sale and title to said land. Stevenson took possession of the land, and nothing more in regard to it appears in the record of any of the cases as here presented in proof until the August Term, 1857, of the Chancery Court, when a decree is entered headed as follows: Wallis Kincaid, *et al., v.* P. S. Deckerd, V. K. Stevenson and others, and Sam and others, by next friend, *v.* V. K. Stevenson, Kincaid, and others, and Bershemar Chrisman *v.* P. S. Deckerd, and others. The decree is as follows:

" This cause came on to be heard before the Honorable B. L. Ridley, Chancellor, Etc., upon the pleadings, etc. Whereupon the Court doth order, etc., that V. K. Stevenson shall have a good, sufficient title to the tract of land in controversy; that the title be divested out of all the parties and vested in the purchaser, V. K. Stevenson; that the trustee of Sam and the other negroes suing have the proceeds of a note in the hands of F. A. Loughmiller, given by V. K. Stevenson." " This payment to Sam and the others, or to their trustees, goes to them as a payment of their interest in the land under the will. The other parties, viz: Wallis Kincaid, and others, having been

paid by P. S. Deckerd a note of about $2,200, the same, when paid into Court, is to go to them. And as to all other questions, Wallis Kincaid and others, the parties represented by A. S. Colyar, agree to release all claim for services of the negroes since the last decree emancipating them—that is, to the negroes which are parties and entitled to their freedom.   V. K. Stevenson must pay the money to the Clerk and Master, not having paid the same into Court. Thereupon the Clerk and Master will    .    .    .    .
In all other respects, the rights of the parties are not now adjudicated."

At the November Term, 1858, under the heading, Wallis Kincaid, *et als., v.* P. S. Deckerd, *et als.,* and Wallis Kincaid and Caperton and wife *v.* P. S. Deckerd, Executor, etc., *et al.,* another decree is entered. This decree, upon a report of the clerk, charges P. S. Deckerd several thousand dollars for hire of negroes; recites the sale of 414 acres of land to V. K. Stevenson, at $20 00 an acre, by P. S. Deckerd, being the same land reported as sold to David Deckerd by P. S. Deckerd, Executor and Commissioner of the Chancery Court, at $15 00 per acre; adjudges this purchase by David Deckerd to have been for the benefit of P. S. Deckerd, and charges him with the $20 00 per acre.   " But it further appears," says this decree, " that, by a former decree of this Court, the negroes claiming a legacy under the will got the benefit of a portion of the second note of V. K. Stevenson, viz: with interest to

this time, $2,109 71." The other parts of the decree relate to other matters of the estate of Wallis Estill, Sr.

The decree of February, 1855, emancipating the slaves when they should comply with the Acts of Assembly, appointed two persons trustees to hire them out to raise the means to send them to Liberia, and, for aught that appears, they were still under the operation of the decree till 1860, when, upon a bill filed by Samuel Estill and others, claiming their services, they were again placed under control of the Chancery Court at Winchester, and so remained until they were set at large, and, in effect, freed by the operation of the civil war.

On the 26th of December, 1865, this bill was filed by Harry and others against P. S. Deckerd, V. K. Stevenson and N. E. Alloway, alleging that they were slaves of Wallis Estill, Sr., deceased, who bequeathed them their freedom, which they were to have at the end of twenty years from his death, which occurred in 1835; that the Chancery Court at Winchester decreed that it was twenty-three years after the death, according to the will; that this time expired in 1855, but that they had, in fact, been held as slaves, under orders of the Chancery Court at Winchester, until the Courts were closed by the war; that they were beneficiaries under the third clause of said Estill's will; that they were entitled to two hundred acres of land out of the Crow Creek farm of said Estill; a copy of which will, or the clause under which they claim,

is herewith filed as part hereof, the whole will being on record, where it may be referred to; that P. S. Deckerd became executor of Estill, and soon became hostile to them; that, without making them parties, he filed a bill at Winchester and procured a decree for the sale of their land, and, in the name of his brother, bought it himself; that he made some sort of conveyance of said land to Stevenson, who conveyed it to Alloway in some way, who now holds possession of the land, or has some one on it; some of complainants being in possession; and prays that the cloud on complainants' title, produced by the deeds aforesaid, and the decree aforesaid be removed, and for rents and a receiver. The will is then copied into the record, and was, we suppose, filed with the bill. There was a demurrer to the bill, we suppose, as there is an order overruling one, but no demurrer appears. There is no *pro confesso* as to P. S. Deckerd. Stevenson and Alloway answer the bill. They admit that complainants were slaves of Estill; that he died long ago, and made a will, as stated in complainants' bill. They admit the sale of the Crow Creek farm, and that Stevenson purchased said land of Deckerd, and that he is now, and has been in possession since his purchase. They state that the date of the sale and all the facts in relation thereto will fully appear by reference to the records in the causes of Wallis Kincaid *v.* P. S. Deckerd and others, and complainants against P. S. Deckerd, respondent Stevenson and others; that said causes were consoli-

dated and heard together, and that said complainants were parties to the record; respondent Stevenson's title to said land was adjudicated, and the title to the same divested out of the heirs and legal representatives of Wallis Estill, Sr., and said complainants, and vested in respondent Stevenson; all of which will more fully appear by reference to the records and decrees in said causes on file, etc., reference to which is made and they made part of the answer. Respondents deny any possession of complainants, unless as trespassers. Respondents, for answer, charge that all the causes of action set up in complainants' bill have been heretofore in your Honorable Court fully adjudicated and settled, and they plead the same in bar to complainants' bill. They also plead the Statute of Limitations. The cause being thus at issue, proof was taken. The proof of the witnesses is unimportant, except that which furnishes copies of the records so far as they remain in the office of the Chancery Court at Winchester. A copy of the deed from David and P. S. Deckerd to V. K. Stevenson is offered and filed, and also of the deed from Stevenson to Alloway. Of what remains of the records, the substance has been already stated. The books of the Chancery Court at Winchester were destroyed up to the year 1850 during the civil war, and many of the papers of causes both before and since 1850 were destroyed or lost. The parties have been able to produce only the following records and parts of records (no effort having been made to sup-

ply lost papers or records, which would, perhaps, have been fruitless): A copy of the will and codicils to the will of Wallis Estill, Sr., deceased; copies of the deed of the Deckerds to Stevenson, and of Stevenson to Alloway; a copy of the will of W. Estill, Jr.; of a portion of the rules made in the various causes, together with some of the orders and decrees.

In this Court this cause has been heard, a rehearing has been granted, and it is now under consideration upon this re-hearing. Of the defences set up by Stevenson and Alloway, that of the Statute of Limitations is now understood to be abandoned. In fact, there is nothing in the cause for it to stand upon. Complainants were under disability of *quasi* slavery until shortly before the filing of their bill, and there is no proof of a continuous adverse possession of the land in controversy for seven years.

Of the defence that there was a former adjudication of the title to the tract of land between the same parties, there is much more to be said. Objection, is made by complainants to the mode in which this defence is pleaded. Whilst it is admitted by complainants that such a defence may be made in an answer, still it insisted that it must there have all the essential qualities and particulars of a plea, and that a valid *plea* of *res judicata* must set out many things which are wanting in defendants' answer. It is insisted upon the other side, that the defence has sufficient particularity as set out in the answer, and if not, that it should have been excepted to or set down for

hearing as insufficient, and that it is too late at the hearing to set up an objection which is really only formal and technical.    It is to be regretted that it is unneccessary to decide these questions in this cause, for it is believed they will scarcely ever be better argued than they have been here.    But, in reality, the defense of *res judicata* fails in this case for want of proof.

Before the filing of the bill in the present case, there were in the Chancery Court at Winchester two causes arising out of the will of Wallis Estill, Sr., which alone could have any connection with the defence above-mentioned.    These were the cases of Wallis Kincaid, *et al.*, *v.* P. S. Deckerd, *et als.*, and Garrett Estill, next friend, etc., of Harry, Sam and others, *v.* Peter S. Deckerd.    The first apparently a general bill, to bring to final adjustment all matters in regard to the estate of Wallis Estill, Sr., and to which probably most, if not all, of the free white persons interested under his will were parties.    The second, a bill to enjoin the sale of Estill's slaves and have them emancipated, filed by them by next friend, etc.    In regard to the first bill, there remains neither bill nor answer ; nor, in fact, perhaps, strictly speaking, any legal evidence of their contents.    Their contents, so far as these appear at all, are to be found in recitals in the other bills and proceedings under it, and in decrees and reports arising under petitions filed under the first and the recitals of such petitions. Both parties seem to have assumed in argument that

the nature and scope of the bill first above-mentioned
are such as above indicated.    The second bill, which
is called a petition, though it has all the features of
an independent bill, is followed by an answer which
appears. in full, and by a decree which is also exhib-
ited.    The first bill was amended for the purpose of
having the slaves sold for misconduct, as has been
already stated.    This amendment is not produced, but
is stated to have been made in the second bill.    If
there were other amendments to either of these bills,
they do not appear, or if other bills were filed, bear-
ing upon the question in this case, they do not ap-
pear.    It seems probable, however, from the heading
of the decree of August, 1857, which is the one re-
lied upon as a bar to the present proceeding, that
both of said bills had been amended so as to bring
in Stevenson as a party, or that two new bills had
been filed, making him a party, and thus originating
a controversy with him about the land.    For he is
put down as a defendant in the heading of both
bills, his name not having previously appeared in any
of the proceedings, and the style of one of the bills
(if, indeed, this be not a new bill) is changed from
Garrett Estill, next friend, etc., of Harry, Sam and
others, *v.* P. S. Deckerd and others, to Sam and
others, by next friend, *v.* V. K. Stevenson, P. S.
Deckerd, and others. .Such a probability, however,
does not .warrant us in coming to the conclusion le-
gally either that such amendments were made or that
new bills were filed.

How, then, does the matter stand upon this defence of *res judicata?*    The complainants, having a beneficial interest in the land purchased by Stevenson, were never made parties to the bill of Wallis Kincaid unless by consolidation, as hereinafter mentioned. The land in which they were interested was sold under a petition in that cause, and, as we think, under all the circumstances, fraudulently purchased by David Deckerd for Peter S. Deckerd, who was the commissioner for its sale, and soon after sold by P. S. Deckerd to V. K. Stevenson, who, though he was guilty of no fraud in fact, as we believe, must, from the reference in his deed to the proceedings by which P. S. Deckerd acquired title, be made, in some degree, to stand in P. S. Deckerd's shoes.    There is nothing in the point that P. S. Deckerd was executor of Wallis Estill, Sr., deceased, and had, therefore, independent power to sell and convey to Stevenson.    He did not convey as executor or under a power, but expressly as an individual owner, showing how he derived title, viz: under the sale by the Chancery Court.    The case of *Gee v. Graves,* 2 Head, 242, is conclusive upon this point, if it need authority.    But it would not be difficult to show that Deckerd had no authority, as executor, to convey this land.    He was simply administrator *de bonis non,* with the will annexed, and, therefore, not, according to the will, *a person appointed by the Court* to carry out the trusts of the will.    It is insisted that though this might all be true, as matters stood before the decree of consolida-

33—VOL. 4.

tion of February, 1855, yet that the decree of August, 1857, after that decree of consolidation, so far made both causes one as that it was binding. Let us see how this is. Now, so far as appears, neither Stevenson nor the slaves were ever made parties to the bill of Wallis Kincaid *v.* P. S. Decherd proper, either before or after the consolidation, nor otherwise, if at all, than by the consolidation. Nor was Stevenson ever made a party to the bill of Garrett Estill, next friend, etc., which was a bill wholly against P. S. Deckerd, as executor, to prevent him from selling the slaves to other parties, and thus endangering their inchoate right to freedom. There were no pleadings in either case to bring about a *contestatio* between either Deckerd and the slaves or Stevenson and the slaves, as to the title or interest of the slaves in the land. Nor, indeed, any contest at any time between any parties, so far as appears, on this subject, except that in the decree of November, 1858, there is an arbitrary dictum that David Deckerd purchased the land for P. S. Deckerd, and the latter is made to account for the price he obtained from Stevenson. It is 'true, that the slaves were interested in the lands sold under the bill of Wallis Kincaid, and they might, by proper pleadings, have brought about a contest in regard to them, but this does not appear to have been done. As to the effect of the consolidation of two bills, the pleadings in which have a single feature in common, and none other, there seems to be some confusion among the

legal profession. No precise line seems to have been drawn as to how far parties in all the causes may be bound by decrees made after consolidation. Nor how far a decree as to some may be void, as to others erroneous, and as to others absolutely binding and conclusive. Nor has any rule been laid down as to the obligation of one party in one' of the consolidated cases to notice the pleadings in another of the cases, where he might have other and independent rights, if he should think proper to assert them. We think, however, it may be safe to say, in this case, that there were not, in fact, any such pleadings as could have justified a decree divesting the title or disposing of the interests of the slaves in the land. The consolidated cases did not make a case where the complainants were bound to speak, or forever after hold their peace. There is no more reason to make them do so (if, indeed, they were bound at all to look into the pleadings of the case of Wallis Kincaid, except so far as their contemplated sale was concerned) than in a case not consolidated, and to which they were no parties, but of the existence of which they had knowledge. They were not bound to intervene, or otherwise lose their rights.

The vagueness of the decree of August, 1857, as to the land, might be another objection to its binding force. It is not, however, necessary to examine this. The cases referred to, upon consolidation and its effect, need not be commented on, as none go so far as to embrace this case.

The defence, then, of *res judicata* cannot prevail. But this does not end the case. By the consolidation of these cases, the complainants, their counsel and trustee (if they had one) appear to have been brought into such connection with the case of Wallis Kincaid *v.* Peter S. Deckerd, *et al.*, as that by the decree of August, 1857, the Court undertook to dispose in their favor of a certain amount of the purchase money to be paid by Stevenson for the land purchased of Peter S. Deckerd. Stevenson, though he has not pleaded, and could not have pleaded, successfully, that he was a *bona fide* purchaser without notice, was guilty of no fraud, was paying a full price, probably, for the land, and would seem to have had no suspicion that he was not, in fact, getting a good title to the land. If, under these circumstances (though their bill may have been legally at an end by final decree), they or their lawfully authorized agent or trustee received part of the purchase money, should they not be made to account for it? They are coming into a Court of Equity to have a cloud removed from their title to land of which they have, under color of legal proceedings, received part of the price. This, though no estoppel to their bill, still imposes on them the necessity of doing equity before they are granted relief. Whether they did, in fact, receive the money by themselves, or their lawfully authorized agent or trustee, must be the subject of future inquiry. As to this matter, it is immaterial whether the land in "controversy" was the land on

Crow Creek. The note of Stevenson was given for the land on Crow Creek, and the money (if received at all by the slaves) was received as part of their interest, under the will, in the Crow Creek lands.

But can this bill be maintained as a bill to remove a cloud from the title of complainants? A demurrer appears to have been filed to the bill, and to have been overruled, but as this does not appear in the record, it cannot be noticed. In a bill to remove a cloud, however, from title, the complainant must show the legal title to be in himself, and that the other has a mere appearance without the reality. This bill is equivalent to an action of ejectment for the Crow Creek lands. Now, where is the title to the Crow Creek lands? The will of Wallis Estill, Sr., in all its parts, is made a part of the bill, and though, by the third clause of the original will, the title to the Crow Creek land is vested in Wallis Estill, Jr., for the use of complainants, with a continuing trust in Wallis Estill, Jr.; yet, by the third codicil this is changed, and the Crow Creek lands are directed absolutely to be sold and the proceeds vested in other lands upon like use and trust. Where real property is given to one in trust for another, and the objects of the trust are completed or the trust has become impracticable, the property vests absolutely in the beneficiary, and such is the case of *White* v. *Bélote*, in 2 Head. But where property is ordered to be sold by a will, and the proceeds directed to be invested in other property, whether on a continuing

trust or otherwise, no title can accrue to the benefic-
iary in the first property.   His title, if it accrue at
all, will become absolute only either in the property
to be bought or in the proceeds of the first prop-
erty.   Now, in the case before us, it might well be
argued that all the substantial reasons exist, at pres-
ent, for regarding this as a continuing trust that ex-
isted before the general emancipation by the war.
The object of the testator, in regard to his slaves,
was both their temporal and eternal good.

There is no little difficulty in saying that the
trust has come to an end even in regard to the res-
idence of the complainants or lands to be purchased
with the proceeds of the Crow Creek lands under the
supervision of a trustee.   However this may be, the
title to the Crow Creek lands remains in the heirs of
Wallis Estill, Sr.   This title has never been divested
by any valid decree.   The bill should have been filed
against these heirs and Stevenson and Alloway, to have
the trusts of the will executed and the deeds of Ste-
venson and Alloway set aside as void.   The bill will
not, however, be dismissed, but remanded to the Chan-
cery Court at Winchester, that the heirs of Wallis Es-
till, Sr., may be made parties, and leave is given to
amend the bill in accordance with this opinion.   Upon
the sale of the lands, complainants will be given the
option to receive the proceeds in money, or to have
the same vested in other lands, and if they cannot
agree among themselves to vest it in other lands,
they shall be entitled to the money.   The bill is

filed for certain persons claiming the fund. It is not stated to be filed for themselves and others, nor is it stated that they are all of the persons entitled. It is suggested that if there are others entitled, they should be made parties. As to the money paid by Stevenson, there will be an inquiry, under the amended bill, whether the same was paid to complainants or any person legally authorized to receive it for them. Stevenson will pay a reasonable rent from the 1st of January, 1858, to the date of his surrender of the property. In ascertaining the rents, the intervention of the civil war will be taken into account. The money paid to the slaves by Stevenson (if any), with interest, will be a set-off *pro tanto* against the rents, and if these should not be sufficient, the balance will be paid him out of the proceeds of the sales of the lands. The costs of this Court and of the Court below, will be paid one-half by complainants and the other half by Stevenson.